UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL DOCKET |
| | ) | |
| versus | ) | NUMBER: 16-32-1 |
| | ) | |
| LOUIS AGE JR. | ) | JUDGE BARRY W. ASHE |
| LOUIS AGE III | ) | |
| RONALD WILSON JR | ) | |
| KENDRICK JOHNSON | ) | |
| STANTON GUILLORY | ) | |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' JOINT MOTION TO CONTINUE TRIAL**

Defendants Louis Age Jr., Louis Age III, Ronald Wilson Jr., and Stanton Guillory respectfully submit this memorandum in support of their joint motion to continue trial. In support of the foregoing motion, the Defendants show as follows:

## <u>INTRODUCTION</u>

Despite the best will in the world and the considerable efforts of counsel to make the current trial date work, the volume and pertinence of government disclosures since February 23rd have presented the defense with an impossible task.

Defense counsel, after working hard on the newly disclosed material have conferred and have reached a consensus that a continuance must be sought in order to allow sufficient time to adequately prepare a defense and provide the effective assistance of counsel.

But for the new and complex issues created by the jailhouse informants, Counsel believe that the necessary work to be ready for trial could be completed with a delay of the current trial schedule of two weeks.  However, the breadth and complexity of the factual and legal issues

generated by the jailhouse informants cannot possibly be tackled in that period and necessitates a request for a continuance of the trial from its current setting.

Undersigned counsel has conferenced this motion with counsel for the government who have advised that they are opposed to the continuance of the trial but would be agreeable to a brief delay of a week.

Defense counsel are grateful for this accommodation but maintain that a week is not sufficient to deal with the work that must be done and that even two weeks cannot permit sufficient time to effectively address the jailhouse informant issues.

### HISTORY OF DISCOVERY

On August 17, 2017, the Government filed its Superseding Indictment against all of the Defendants. Rec. Doc. 52. The Government's initial discovery production was particularly voluminous: including 2056 hours of recorded audio, 52 hours of video, and over 479, 576 pages of documents. *See* Rec. Doc. 335 at p. 5. Despite the volume of evidence initially produced, it became apparent to defense counsel that the Government had not disclosed or produced much of the critical information it would use at trial.

Thereafter, the Defendants filed numerous discovery motions seeking to compel the Government to produce the critical materials being withheld from the Defendants. *See* Rec. Docs. 275 (Louis Age Jr.'s Motion for *Brady* Materials), 276 (Louis Age Jr.'s Motion for Bill of Particulars), 277 (Louis Age Jr.'s Motion for Discovery), 278 (Louis Age Jr.'s Motion for Subpoena Duces Tecum for Juvenile Records); 279 (Kendrick Johnson's Motion for Bill of Particulars); 288 (Stanton Guillory's Motion for Bill of Particulars).

The Government opposed these requests, citing concerns for witness safety—though it failed to produce "any evidence of an immediate threat to witness safety." *See* Rec. Doc. 335 at p.

14. Instead, the Government proposed that it would produce *Jencks*, *Brady*, and *Giglio* material that the Government deemed "non-security risk" two weeks before trial and would produce all *Jencks*, *Brady*, and *Giglio* that it deemed to be a "security risk" one week before trial. Rec. Doc. 335 at p. 13. Defendants objected to the timeline, arguing it would not provide their counsel adequate time to review the materials and conduct any necessary follow-up investigations.

Relying, in large part, on the Government's representation that the material to be produced would be limited, and without having seen any of the material, the Magistrate Judge determined the Government's proposed Production Timeline would provide defense counsel sufficient time "to review and…conduct follow up investigation." *See* Rec. Doc. 335 at p. 14 (emphasis added).

Whatever may have been the expectation in December 2019 when the discovery schedule was set, in March 2022 with the disclosures in hand it is clear that even with the government **m**aking discovery a week early (for which the defense is grateful) the amount of work is too great to be performed in the time allowed.

But the quantity and quality of materials that would be produced last-minute, as well as the time needed to adequately review and respond to the materials, was profoundly underestimated.

**Quantum of records produced**

First, the sheer volume of documents so far produced has exceeded the amount of materials that would fit into a single box. Over the past thirteen days, the Government has made the following productions:

1. On February 23, 2022, the Government produced 148 files, amounting to 1,674 bates stamp numbers.  Four of the files were untranscribed audio interviews totaling 79 minutes;

2. On February 25, 2022, the Government produced 110 files, amounting to 1,330 bates stamp numbers.  Two of the files were untranscribed audio interviews totaling 48 minutes;

3. On March 3, 2022, the Government produced 9 .zip files involving disk images or data dumps from cellular devices and hard drives containing 17.9 GB of data;

4. On March 4, 2022 the Government produced 66 files, amounting to 731 bates stamp numbers.  Two of the files were untranscribed audio interviews totaling 54 minutes, another file was a video interview totaling 116 minutes.

In addition, on 2/28/2022, the government provided 124 files, being its then proposed trial exhibits, a mixture of documents, reports, audio and visual materials.  On the evening of 3/7/2022 the government produced a differently numbered and expanded set of trial exhibits totaling 198 files.

Of the files provided, some have proven to be incorrectly labeled and others, on closer inspection, have been discovered to be duplicates.  This is not a criticism, these things happen, but it points to the methodical care necessary to review these records.

The discovery files that have been reviewed have identified the existence of other items that have not been produced.  For instance, on 3/2/2022, after working methodically through the 2/23 discovery, undersigned counsel sent a list to the government of 25 items or clarifications arising from the 2/23 discovery.  The government responded diligently and provided answers or a status on the questioned items, producing more material for review.  Unfortunately, due to the pressure of the court timetable, undersigned counsel was forced to abandon a methodical review of the 2/25 disclosures and has still not been able to review each document despite working long and hard on the project.  Nevertheless, various missing items have been identified and requested from the government even as this motion is being finalized.  More such requests will inevitably follow.

**Quality of the records produced**

To describe the recently disclosed materials as "important" would be an understatement. Until these productions, the government had provided statements about the nature of its allegations, without naming its witnesses, but the defense had not been supplied with the accounts of the witnesses as to how, when and where things were meant to have occurred or the details of statements alleged to have been made.

As expected, FBI 302s and grand jury transcripts for cooperating witnesses Ayanna Age, Raheem Jackson, Brian Marigny and Charles Lewis were provided. However, the volume of these materials is unusual. For Ayanna Age alone, the government provided 40 302s or grand jury transcripts, with the grand jury transcripts, albeit often duplicative, totaling about 400 pages. These accounts of Ayanna's prior statements are extremely dense and often contradictory as Ayanna changed her story over time and added more and more detail.

It is not enough to prepare to defend a case to simply read this material, which is challenge enough, the information must be assimilated, compared for internal consistency, compared with the statements of other witnesses, compared with other real world or scientific evidence, assessed in the context of the chronology in which it developed and documented for use at trial. As an example, taking one vignette from Ayanna's story, it took undersigned counsel 8-10 hours of this process to understand and develop evidence that Ayanna had changed her story, and that her eventual story was not true and refuted by a number of points of other evidence. And this was for just one vignette out of the story of a witness whose account and allegations literally extend from childhood until almost the present day.

It is not only Ayanna, there were multiple accounts from Jackson, Marigny, Lewis and others, some of which are buried in audio files, which must be listened to in their entirety as they have not been transcribed.

Then, on top of this, came the February 25 surprise revelation of multiple jailhouse informants, three of whom have provided exceedingly detailed accounts of alleged conversations with one or more co-defendants that have occurred over an extended period while under FBI tutelage.

This revelation was followed by the March 4 revelation that one of the jailhouse informants had admitted that his previous statements had included lies and that he had obtained information about the case by buying it from other jailhouse informants engaged in the same enterprise of obtaining sentencing benefits.

As discussed below, factual and legal issues abound once the material itself is digested and understood.

Since the Defendants' ability to adequately respond to this newly disclosed information is critical to the fairness of their trial and the effectiveness of their counsel, defense counsel must be allowed an adequate opportunity to completely review the materials, conduct necessary factual-investigations, and brief the relevant legal issues.

Because the six-day timeframe does not allow defense counsel sufficient time to accomplish these tasks, the Defendants jointly request that the Court continue the trial date.

## **LAW ARGUMENT**

It must be emphasized from the outset that, at stake here, are two of the most jealously guarded Constitutional rights: a defendant's right to effective assistance of counsel, and a fundamentally fair trial.

Over half a century ago, the Supreme Court cautioned that "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). The Fifth Circuit further expounded upon this idea in *United States v. Uptain*:

> [A] scheduled trial date should never become such an overarching end that it
> results in the erosion of the defendant's right to a fair trial. If forcing a defendant
> to an early trial date substantially impairs his ability to effectively present
> evidence to rebut the prosecution's case or to establish defenses, then pursuit of
> the goal of expeditiousness is far more detrimental to our common purposes in the
> criminal justice system than the delay of a few days or weeks that may be sought.
> *United States v. Uptain*, 531 F.2d 1281, 1291 (5th Cir. 1976).

Other Circuits have likewise felt "compelled to caution against the potential dangers of haste, and to reiterate that an insistence upon expeditiousness in some cases renders the right to defend with counsel an empty formality." *United States v. Verderame*, 51 F.3d 249, 252 (11th Cir. 1995) ("This case presents an instance where a court, in its haste, denied compelling unopposed motions for continuance and in so doing eviscerated one of the Sixth Amendment's essential safeguards").

Congress codified these principles in the Speedy Trial Act, 18 U.S.C. § 3161 et seq., which permits the court to grant a continuance upon a determination that "the ends of justice served by [granting the continuance] outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161 (h)(7)(A). Amongst the factors to be considered are:

> (i) Whether the failure to grant such a continuance in the proceeding would be
> likely to make a continuation of such proceeding impossible, or result in a
> miscarriage of justice.

> (ii) Whether the case is so unusual or so complex, due to the number of defendants,
> the nature of the prosecution, or the existence of novel questions of fact or law, that
> it is unreasonable to expect adequate preparation for pretrial proceedings or for the
> trial itself within the time limits established by this section.

> …

(iv) Whether the failure to grant such a continuance…would deny the defendant reasonable time to obtain counsel…or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence. 18 U.S.C. § 3161 (h)(7)(A)(B).

The Fifth Circuit likewise acknowledges the need to allow defense counsel additional time to adequately prepare as demanding a continuance in certain situations. In making this determination, trial courts are to consider factors such as "the amount of time available for preparation; defendant's role in shortening the time needed; the likelihood of prejudice from the denial; and the availability of discovery from the prosecution." *United States v. Messervey*, 317 F.3d 457, 462 (5th Cir. 2002).

As detailed below, these factors overwhelmingly weigh in favor of granting the Defendants' request for a continuance.

## I.  The Availability of Discovery from the Prosecution and the Complexity of the Case

To fully appreciate the need for additional time to prepare their defense, it is important to begin with an understanding of the complexity of the case, the unique history of discovery production and the significant pieces of information just now being revealed to the Defendants.

That this case is complex cannot be refuted. Since filing the Superseding Indictment, the Government has characterized this case an amalgamation of two other complex and entirely distinct prosecutions: a federal health care fraud prosecution against Louis Age, Jr.; and a state racketeering prosecution against the 110ers gang. The Government's plotting the course of the current prosecution between two other cases resulted in the Government producing thousands of hours of audio files and video files; and over half a million pages of documents to the Defendants.

But at the same time that the Government provided these voluminous records on the Defendants, it also redacted and otherwise withheld the most critical pieces of evidence.  As a

result, the Defendants were forced to sift through hundreds of thousands of documents relating to two complex prosecutions in order to speculate as to <u>what</u> was the Government's exact theory of prosecution and <u>how</u> the Government would attempt to prove it at trial.

As described above, only now has the material genuinely relevant to the government's case been disclosed.  Further, as described above, the challenge is not just to read each document produced but to assimilate that material, develop an investigation and litigation strategy, implement that investigation and litigation, conduct the follow up investigation or litigation it generates and based on reasonable factual and legal investigation form a strategy to be implemented at trial.

Because the amount of critical evidence not made available to the Defendants until less than three weeks before a complex, multi-week trial, estimated to involve over 30 Government witnesses;[1] the evidence should be considered relatively unavailable for effective use by defense counsel on the current timetable. These factors weighs in favor of granting the continuance.

## II.   The Amount of Time Available for Preparation and the Defendant's Role in Shortening the Time Needed

As of the date of filing, the Defendants have six days to prepare for trial. Given both the volume and nature of the Government's recent disclosures, as well as, the significant factual and legal issues raised by these materials, it has become clear to undersigned counsel that this time period is not enough to adequately review the materials, discuss their contents with the Defendants, and prepare to defend against them.

_Counsel's Inability to Personally to Review the Recently Produced Materials_

---

[1] *See Schwarz v. United States,* 828 F. App'x 628, 635 (11th Cir. 2020) (finding "voluminous discovery" and an anticipated "twenty-day trial" to be indicative of a complex trial).

As of today's date, none of the undersigned counsel—or any combination thereof—have been able to completely review all of the newly produced materials. In order to detail their efforts and progress in reviewing the materials, undersigned counsel submit the following account of time[2] spent on the case[3] in the nine business days[4] dating since February 23rd:

- Counsel for Guillory submit they have spent 131.7 hours on the case since February 23rd and they have been able to review between half and two-thirds of the tendered discovery—though they have not had time to fully digest the materials, or to assimilate them into the defense strategy.

- Counsel for Age Jr. submit they have spent 171 hours on the case since February 23rd, and they have been able to review between half and two-thirds of the tendered discovery—though they have not had time to fully digest the materials, or to assimilate them into the defense strategy.

- Counsel for Age III, submit they have spent 122 hours on the case since February 23rd, and they have been able to review between half and two-thirds of the tendered discovery—though they have not had time to fully digest the materials, or to assimilate them into the defense strategy.

- Counsel for Wilson, submit they have spent approximately 95 hours on the case since February 23rd, and they have been able to review approximately half of the tendered discovery—though they have not had time to fully digest the materials, or to assimilate

---

[2] This is a lengthy motion and while appointed counsel have been involved in finalizing the motion it was drafted by an assistant whose hours are not included in the tally of hours below.  This point is made lest anyone wrongly think that counsel could not get through discovery because they spent too much time working on the continuance motion.
[3] Note all of this time has been spent in discovery review as counsel have had to meet a punishing set of deadlines for litigation and preparation of trial documents as well as conducting meetings with clients.
[4] Counsel have worked through the Mardi Gras weekend as well but it seems unreasonable that this simply become a fixed minimum expectation.

them into the defense strategy.

It is important to highlight that the above-referenced "review" consists solely of a reading (or listening) to the materials and taking notes. With the exception described earlier, it does not include the analysis, cross-referencing, follow-up investigation, or legal research necessary to adequately "review" materials in preparation for trial.

_Counsel's Inability to Review the Materials with their Clients_

In addition to counsel's being unable to personally fully review the materials, the Defendants have likewise been unable to fully review the materials—limiting meaningful discussion between the attorneys and their clients. This is a natural function of the restrictions imposed by the Protective Order[5] covering most of the materials, as well as logistical issues with conducting attorney-client visits at Plaquemines Parish Prison ("Plaquemines").

Because of the enhanced restrictions imposed on defense counsel's use of the February 25 and some of the March 4 materials, the Defendants can only review the materials under two scenarios: (1) if defense counsel copies the materials and delivers the copies to the U.S. Marshals, then the Defendant can be transported to the Hale Boggs building to review the materials in the physical presence of the U.S. Marshals, who will then retrieve the materials before the Defendant leaves; or (2) defense counsel may personally review the materials with the client during an attorney-client visit at Plaquemines—again, provided that the materials are not left with the Defendant. Both options present pitfalls rendering them inefficient and ineffective given the time constraints.

The US Attorney's Office and Marshalls have been responsive to defense requests to have the clients brought to Hale Boggs and the defense are grateful. This has provided a venue for

---

[5] Rec. Doc. 636.

defendants to read the protected documents, within the limits of their relative literacy and concentration span. Due to the visiting conditions, however, it is not a viable venue for conferences with the clients and reviewing documents. The visiting area is non-contact booths with a double mesh screen between attorney and client preventing passing through or even pointing out parts of documents and making it difficult to even make out the client's face, let alone carry on more than a brief conversation. The visiting booths are also not sound proof and one can hear between booths. The documents are dense and review is time consuming – on March 9 Louis Age Jr will return for his third stint in the cells to attempt to compete a review of the materials. The court ordered the he be provided his prescription glasses by the start of trial and that has not yet happened, reducing his capacity for prolonged reading. Again, this is not so much to complain as to acknowledge the natural obstacles that occur in a situation like this.

Until March 7, none of the defendants have been able to have a contact visit at Plaquemines where they are now all held. Plaquemine has now provided two defendants an attorney contact visit each by special arrangement. Zoom visits and non-contact visits[6] have been available by prior arrangement. Plaquemine requires 24 hours notice for visits and is not open for visiting on weekends. Lt. Tinson at Plaquemines has proven a reliable and cooperative partner in scheduling visits within these constraints. Until contact visits resumed, yesterday, counsel have not had an environment where they can meet, speak freely and effectively discuss documents or review audio-visual material with clients. That situation is improving but not in sufficient time to get through all that must be done before trial.

---

[6] In-person non-contact visits occur in an area designed for family visits: an approximately 42"inch cubicle in a row of cubicles, fitted with a narrow shelf and fixed stool not conducive for long periods of sitting, partitioned by a pane of soundproof glass, and allowing communication only through a single telephone receiver. A meeting with both counsel simultaneously is practically impossible, given the space limitations. And the need talk through a telephone receiver and show documents through a thick plate of glass makes reviewing documents for a sustained period of time impractical.

Moreover, travelling to and from Plaquemines comes with the additional costs of two-and-a-half hours travel time—critical time counsel could be using to read discovery or otherwise prepare for trial. A recent episode by defense counsel highlights the predicament:

- On Wednesday March 2, 2022, counsel for Age III met with their client in the Hale Boggs Building. However, Age III, who is a type-2 diabetic, was in poor condition because he had been transported from Nelson Coleman Correctional Center prior to being served breakfast. Although his condition improved after the U.S. Marshals brought him juice and a sandwich, he was otherwise unable to engage in a meaningful discussion of the voluminous materials. Counsel therefore, decided to end the meeting and review the materials with Age III the following morning at Plaquemines Parish Prison. Upon arrival the following day (Thursday), staff at Plaquemines informed counsel there was no room within which they could conduct a contact visit. After two unproductive hours of Age III and his attorneys trying to discuss voluminous materials through a pane of glass and a single telephone-receiver, counsel inquired about a contact visit on Saturday, March 5th. Although the ranking officer indicated a contact visit could likely be arranged, the following day (Friday), counsel were notified that due to a guard shortage, a Saturday visit would not be possible. On Monday, March 7th, counsel were finally able to have a contact meeting with Age III.

Due to these various logistical issues, as of today's date none of the Defendants have been able to fully review the recently produced materials personally or with counsel.

*Insufficient Time to Perform Follow-Up Investigation and Litigation*

In addition to the time needed to simply review the recently produced materials, more time is needed to investigate and respond to critical factual and legal issues raised by recently disclosed materials. Undersigned counsel submit the following to detail the (1) critical disclosures made in the Government's recent discovery productions, (2) the factual and legal issues raised by those disclosures, and (3) the specific tasks required to respond to those disclosures:

1) Incriminating Statements Purportedly Made by Defendants to Jailhouse Informants

A. The Recently Disclosed Materials

On February 25 and March 4, the Government produced various 302's of individuals who allegedly received incriminating information from some of the Defendants. Notably, this marked

the first time defense counsel learned of either the existence of these purported confessions and the jailhouse informants to whom they were purportedly made. More specifically, the recently produced materials reveal the following:

- A 7-page 302, drafted on August 2, 2019 and entered on November 8, 2021 indicates the JR[7] alleges to have encountered Defendant Ronald Wilson and Defendant Louis Age III at various times while being housed at a Correctional Center in St. Charles Parish. In the 302, JR alleges that both Wilson and Age III made incriminating statements concerning their case; statements which identified the other co-defendants by name (or alias), and inculpated the co-defendants, as well. The 302 further conveys that on 8/2/19, 8/14/19, 8/20/19, 9/3/19, 9/24/19, 2/12/20, JR contacted FBI agent William C. Williams by telephone to provide additional information allegedly gained from Wilson and Age III. The recordings of these calls have not been disclosed by the Government. Other materials identify that prior to these encounters, JR had already been working as an informant for the government in another case and for local law enforcement running the facility.

- In a subsequent 302, drafted on January 31, 2022, JR reveals that previously provided incriminating information was actually provided to JR by GS and TS. According to the 302, GS indicated he would "sell" the incriminating information to JR but that JR ultimately failed to pay for the information. Both GS and TS are jailhouse informants in their own right, seeking to trade information with the government for sentencing reductions.

- A 7-page 302, drafted on July 22, 2019 and entered on April 29, 2021, indicates that TS alleges to have encountered Defendant Age, Jr. while being housed at the St. Tammany Jail. TS further alleges that Age Jr. made statements to TS. The 302 further provides that TS alleges to have encountered Defendant Stanton Guillory while being housed at Orleans Parish Prison. TS further alleges that Guillory made multiple incriminating statements to TS. The 302 further provides that an additional interview with TS occurred on January 20, 2019.

- A 12-page 302, drafted on January 14, 2020 and entered on November 15, 2021, indicates that MC alleges to have encountered Defendant Ronald Wilson while being housed at St. Charles Jail. MC further alleges that, during this time, Defendant Wilson made statements to MC that allegedly detailed the crime at hand, and inculpated the other co-defendants. The 302 further provides that subsequent interviews between MC and the Government, occurred on January 21, 2020; February 10, 2020 (via

---

[7] Undersigned counsel and counsel for the government have conferred and agreed that initials should be used to describe these confidential informants.

telephone); March 2, 2020 (via telephone); and March 9, 2020 (via telephone). The recordings of these calls have not been disclosed by the Government.

B. Issues Requiring Additional Work

As a general matter, defense counsel will need adequate time to factually investigate these jailhouse informants in order to develop impeachment material[8] and to otherwise develop evidence to contest and defend against the contents of these incriminatory statements.[9] Counsel also needs additional time to research and draft motions to suppress in relation to the unlawfully obtained statements of custodial defendants and motions *in limine* concerning prior bad acts listed in the 302's.

The statements of a co-defendant not in the course of and in furtherance of a conspiracy represent a classic example of evidence admissible against one defendant (statement of a part opponent) but not admissible against other defendants (statement of unavailable witness offered for the truth of its contents). Post-arrest statements of a co-defendant to a jailhouse informant are the quintessential example of prejudicial but inadmissible material presented before the jury in a joint trial. As such, the defendants must now prepare and file motions to sever or redact, as the government had not disclosed the existence of jailhouse informants when severance was last litigated.

The information disclosed in the 302s and the necessary factual development for effective litigation involve a mountain of work in discovery, investigation and further litigation.

---

[8] *United States v. Muniz-Borrero*, 286 F. App'x 240, 241 (5th Cir. 2008) (per curiam) (listing a defendant's hypothetical inability to "impeach [a witness's] testimony" as a "specific prejudice" that could result from the denial of a continuance).

[9] *See, e.g., United States v. Cutno*, No. 05-CR-268, 2013 U.S. Dist. LEXIS 158989, at *6 n.1 (E.D. La. Nov. 5, 2013) (J. Lemelle) (describing the court's prior granting of a continuance to allow defense counsel additional time to prepare against newly disclosed evidence of a confession).

First, the fact that GS and/or TS possessed information about this case and then "sold" the information to JR, and perhaps other individuals, who thereafter presented the information as having been disclosed to them personally obviously calls into question the veracity of the information being relayed, the truthfulness of the jailhouse informants, and the integrity of the Government's investigation. The government has quite properly disclosed evidence of corruption of its jailhouse informant system and the defense must be provided time to fully investigate this corruption and exploit it in both litigation and at trial. Neither defense counsel nor this court is expected to nor should assume that the current government disclosure is the whole of the story, indeed, that is the point of the opportunity to investigate in an adversarial system. Defense counsel requires additional time to investigate the extent to which the practice of trafficking in real or invented information about cases n these facilities taints the information provided in respect of the current defendants and the role, if any, that government actors have played.

Second, when JR identified the source of sold information as GS he also opened a can of worms as GS is one of the most notorious and prolific self-confessed murderers and cooperating witnesses in the District, whose extraordinary relationship with the EDLA US Attorney's Office has been a topic of media commentary. With GS involved in a racket to falsely attract sentencing reductions in the facility, the scope of the investigation and impeachment has expanded exponentially.

Third, the recent revelation that GS would play a role in this case raises a potential conflict of interest. Counsel for Defendant Age III, served previously as counsel for GS during a substantial portion of the prosecution that resulted in the life sentence that GS is currently attempting to reduce through assistance to the government. Calling attention to GS's role in trafficking this information to others in anticipation that it would be used at trial raises serious legal concerns that would be

prejudicial to GS's interests in having his sentence reduced. Additionally, counsel participated in a number of debriefings involving GS and Government agents and thereby learned confidential non-public information concerning GS, the use of which would be both contrary to his former client's interest, and in accordance with his current client's interests. The government has been made aware of this difficulty.  A continuance is warranted to factually investigate the extent of **GS'S** involvement in this case; and the legal implications of potentially conflicted-counsel's continued representation of Age Jr.[10]

Fourth, the circumstances surrounding the statements give rise to the need to investigate a likely Sixth Amendment issue that would preclude the Government from introducing the statements at trial. *See Massiah v. United States,* 377 U.S. 201, 206 (1964). Given the limited information currently available to defense counsel, there is a good-faith basis to believe that a *Massiah* violation has occurred and additional evidence is available to support that point.  Counsel acknowledges that in the 302s the Special Agent asserts, in effect, that he hewed to the line of *Massiah* but the actions and history of the informants suggest otherwise as does the history of this institution in producing jailhouse informants with ongoing relationships with law enforcement.

Judge Ellison recently granted habeas relief in a capital case in Harris County arising from violations of *Brady* and *Massiah*.  *Prible v. Davis*, 2020 U.S. Dist. LEXIS 89711 (S.D. Tex. May 20, 2020).  That case is significant not only for its ruling but for its extraordinary procedural history.  The case went through multiple rounds of state and federal collateral review as more and more evidence was uncovered of how the jailhouse informant system was being run before the evidence was ultimately developed to prove a constitutional violation.  The case represents a template for the type of painstaking investigation required to peel back the layers of the onion and

---

[10] *See, e.g., United States v. Bailey*, 689 F. Supp. 1478, 1480 (N.D. Ill. 1987) (granting a continuance in light of a recently discovered conflict caused by defense counsel's previous representation of a Government witness).

unveil constitutional violations in this area of investigatory and prosecutorial practice. *Prible*, somewhat like the current situation, involved a ring of informants working together in a facility and simultaneously cooperating with the government.

Additional time is needed to subpoena and analyze records related: to the jailhouse informants, including the timing and source of any transfers; as well as the timing and contents of any calls made between the informants and Government agents (many of these calls were recorded but have not yet been produced). Further, records must be obtained of the history and pattern of informant activities by these informants acting individually or as a ring of informants, as they did here. On the ground investigation, involving interviews with numerous other inmates and victims of the informant ring as well as law enforcement personnel at the facility and involved with the informants is also required. It is reasonably expected that this information will yield further evidence supporting a motion to suppress and, at the very least, will develop critical evidence eviscerating the credibility of the identified informants and any others emerging from this corrupted environment.

Finally, and at a more prosaic level, additional time is required to perform field investigation to develop evidence that the statements attributed to various defendants are factually untrue and therefore less likely to have been uttered. This is a critical technique in discrediting jailhouse informant testimony.

It is to be remembered that "jailhouse informants have played a role in 156 proven wrongful convictions in the United States, according to the National Registry of Exonerations . . . [and that] . . . incentivized informant witnesses were the leading cause of wrongful convictions in U.S. capital cases."[11]

---

[11]   Innocence Project, *Safeguarding Against Unreliable Jailhouse Informant Testimony* available at *https://innocenceproject.org/safeguarding-against-unreliable-jailhouse-informant-testimony/* (last visited 3/8/22).

### 2) Ayanna Alvarez's Numerous Statements to Investigators

A. The Recently Disclosed Materials

The Government's recent disclosure include of over 300 pages of statements made to investigators by the Government's key cooperating witness, Ayanna Alvarez. Ayanna's role in the Prosecution's case cannot be overemphasized: she will testify to alleged pre-2005 fraud; the alleged healthcare fraud at SLHHC; the alleged arson-related insurance fraud conspiracies; the alleged murder-for-hire plot concerning her former husband, Ron Alvarez; and the alleged murder-for-hire plot concerning Milton Womack. In addition to being the star cooperating witness, Ayanna is also an alleged victim.

In short, every detail of her prior statements is critical to the defense.

The recent disclosures betray a web of lies unfolding over the course of about 40 302s and grand jury transcripts.  Ayanna's various versions evolve over time with numerous contradictions and changes of story.  In the end she presents an incredibly detailed account but fact checking of those details has already begun to reveal that her version is contradicted by other witnesses and objective facts.

B. Issues Requiring Additional Work

The time consuming nature of the task of moving through Ayanna's densely packed, ever moving and often contradictory accounts cannot be overstated.

In addition to thoroughly reviewing, analyzing, and cross-referencing Ayanna's statements; efforts must be made to corroborate or contest the numerous allegations contained within the interviews—through witness interviews and by consultation with objectively provable facts. Defense counsel requires additional time to adequately prepare to defend against the multitude of allegations—the details of which have just recently disclosed.

Further documents must also be obtained from the government, including, not least of all, the transcript of her plea in MDLA and numerous additional 302s that appear from her testimony to exist but have not been disclosed.

### 3)  Numerous other cooperating witness statements to Investigators

Ayanna is not alone in having provided numerous, at times evolving accounts of events. Lewis, Jackson and Marigny have provided numerous accounts, now disclosed for the first time. Similarly, a number of additional witnesses have provided multiple, sometimes conflicting accounts. These accounts must be examined carefully to ensure that they are not misunderstood or misused. For example, in a previous Brady disclosure, the government advised that two female witnesses had implicated Jackson and exculpated Guillory but then retracted this account, agreeing they were covering for Guillory. This is not entirely true. Carefully reviewing the multiple 302s and grand jury transcripts of these witnesses discloses that, contrary to the impression given by the government, one of these witnesses continues to directly implicate Jackson. She claims that later on the night of the murder he was brandishing the gun believed to be the murder weapon and bragging that he "hit a lick." The witness agreed she had exaggerated another part of her story about Jackson but nevertheless implicated him and not Guillory in this confessional behavior.

Additional time is needed for the careful review of all of the materials now provided as all pf the pages are proving to be densely packed with highly pertinent and complexly interwoven statements.

#### _Considerations for Additional Trial Preparation that must be done simultaneously_

Finally, any analysis of the "time available" must also consider the additional work defense counsel must complete simultaneous to their reviewing the materials, discussing the materials with their clients, and conducting appropriate follow-up investigations and research. As other courts

have recognized, counsel cannot "spen[d] every waking hour reviewing documents"; at the same time, they are also "professionally obligated to present and respond to pre-trial motions, to draft jury instructions and voir dire questions, and to seek and prepare possible defense witnesses, including experts." *Schwarz v. United States,* 828 F. App'x 628, 634 (11th Cir. 2020). The same is true for undersigned counsel, who, during the same timeframe, have been tasked with the following: (1) submit objections to exhibits, and responses to any objections lodged by the Government; (2) propose *voir dire* questions*,* and lodge any objection to questions proposed by the Government;  (3) propose limiting instructions regarding spillover evidence, propose final jury instructions, and lodge any objections to the Government's proposed limiting instructions and final jury instructions; (4) propose a jury verdict form, and lodge any objections to the Government's jury verdict form; (5) prepare a brief joint description of the case; (6) prepare a list of potential witnesses, and key persons who may be mentioned during trial; (7) confer with counsel for the Government to create a joint exhibit book to be used at trial; (8) confer with counsel for the Government regarding the submission of joint stipulations for trial; (9) exchange demonstrative exhibits with counsel for the Government; and (10) arrange for appropriate trial clothing for the incarcerated defendants. *See* Rec. Doc. 627.

In short, six days is simply not enough time for defense counsel to meaningfully review all of the newly produced materials, meaningfully discuss this information with the Defendants, and respond with necessary follow-up investigations and motions practice.  These factors weigh in favor of a continuance.

## III.   The Likelihood of Prejudice without a Continuance

That the Defendants will be prejudiced without being granted a continuance is not speculative; it is imminent. As detailed above, the types of evidence that have recently been

disclosed are critical and require substantial additional work for the defense to defend against and take advantage of the information in presenting a defense.

Analyzing the likelihood of prejudice in the absence of a continuance must take into account that defense counsel were completely unaware of many of these individuals, the information attributed to them, and their role in prosecution's case—a factor indicative of a risk of prejudice. *Cf. United States v. Diaz,* 941 F.3d 729, 741 (5th Cir. 2019) (finding defendant's "prior knowledge" of the information alleged to have been "recently disclosed" as indicating a "low chance of prejudice to the defense in denying the continuance").

The analysis must also consider the extremely prejudicial nature of the newly disclosed materials. Indeed, it is difficult to imagine a piece of evidence more prejudicial to the Defendants than multiple confessions, implicating the other Co-Defendants, as well. Unsurprisingly, other courts faced with the discovery of incriminating co-defendant statements, giving rise to a potential prejudice, have determined that "failure to grant a continuance would deprive the defendants of the time to review discovery material, conduct any follow-up factual investigation, identify and pursue any appropriate pre-trial motions." *United States v. McBayne*, No. 07-CR-157, 2008 U.S. Dist. LEXIS 19837, at *5 (E.D. Tenn. Mar. 4, 2008); *see also United States v. Cutno*, No. 05-CR-268, 2013 U.S. Dist. LEXIS 158989, at *6 n.1 (E.D. La. Nov. 5, 2013) (J. Lemelle) (describing the court's prior granting of a continuance to allow defense counsel additional time to prepare against newly disclosed evidence of a confession).

Because many of the newly disclosed materials are both entirely unforeseen, and extremely prejudicial, a continuance must be granted to avoid trial by ambush. It is critical that defense counsel be given additional time to review these materials and fully discuss their contents with the Defendants. *See, e.g., United States v. Johnson,* No. 21-CR-288 2021 U.S. Dist. LEXIS 183091,

at *2 (M.D. Ala. Sep. 24, 2021) (granting a defendant's motion for a continuance where defense had "recently received additional discovery" and "require[d] additional time to review the discovery and adequately advise the Defendant"); *see also United States v. Jarman,* 2011 U.S. Dist. LEXIS 163188, at *14 (M.D. La. Dec. 6, 2011) (noting that "the Defendant is entitled to <u>ample opportunity</u> to examine the evidence") (emphasis added). It is also critical that counsel be allowed additional time to "conduct any necessary additional actions in light of the [newly discovered evidence] to prepare [the Defendants'] defense"[12], such as fact-investigations to develop basic impeachment material on newly revealed witnesses.[13]

Refusing defense counsel additional time needed to complete these most elementary tasks will do more than prejudice the Defendants; it will undermine the basic principles of fair play, due process, and the right to counsel. This factor weighs in favor of granting the continuance.

## IV.   Recent Examples from the Eastern District of Louisiana Counsel in Favor of the Continuance

As detailed above, the Defendants do not ask the Court for a continuance as a dilatory tactic, or to gain an advantage over the Government; they seek a continuance to fully review last-minute disclosures concerning matters of critical importance, and to adequately respond to those matters. Nor do they ask the Court to break new ground in granting a continuance based on the late disclosure of critical information.

---

[12] *United States v. Rodriguez-Guerrero*, No. 21-CR-00088, 2021 U.S. Dist. LEXIS 99615, at *2 (W.D. Okla. May 26, 2021) (finding a 60-day continuance necessary to prepare the defense)

[13] *Cf. United States v. Muniz-Borrero*, 286 F. App'x 240, 241 (5th Cir. 2008) (per curiam) (listing a defendant's hypothetical inability to "impeach [a witness's] testimony" as a "specific prejudice" that could result from the denial of a continuance).

In *United States v. Evans Lewis, et al*,[14] defense counsel requested a continuance on the Sunday before a Monday trial due to their inability to completely review voluminous evidence that had been produced thirteen days prior. *See* Case No. 2:15-cr-154, Rec. Doc. 727-1. Judge Zainey granted the continuance based, in part, upon on a determination "that failure to grant a continuance in the proceeding will result in a miscarriage of justice and would deny counsel for the defendants the reasonable time necessary for effective preparation." *See* Case No. 2:15-cr-154, Rec. Doc. 734 at pp. 1-2

Undersigned counsel respectfully request that the Court do the same, grant the Motion for a Continuance, and allow them additional time to adequately review and prepare against these unforeseen, last-minute disclosures.

## CONCLUSION

For all of the foregoing reasons, the Court should grant the Defendants' Motion to Continue.

Respectfully submitted,

*/s/ Alysson L. Mills*
ALYSSON L. MILLS
650 Poydras Street, Suite 1525
New Orleans, LA 70130
amills@millsamond.com

Attorney for Stanton Guillory

| | |
|---|---|
| *s/ Jessica Mullaly* | */s/ Kerry P. Cuccia* |
| Jessica L. Mullaly, LA Bar #26674 | KERRY P. CUCCIA |
| Attorney for Ronald Wilson | 3801 Canal Street |
| 7925 nelson Street | Suite 400 |
| New Orleans, LA 70125 | New Orleans, LA  70119 |

---

[14] Case No. 2:15-cr-154, Rec. Docs. 727, 734 (E.D. La. Sep. 19, 2016).

Telephone: 504-258-7294                                       504-595-8965
Email: jessicamullaly1@gmail.com                              Email: kerryc@capitald.org

Attorney for Ronald Wilson                                    Attorney for Stanton Guillory

*/s/ Richard Bourke*
Richard Bourke, LA #31428                                     *Nicholas J. Trenticosta*
Christine Lehmann LA 28122                                    Nicholas J. Trenticosta
Attorneys for Louis Age, Jr.                                  Herrero & Trenticosta
Louisiana Capital Assistance Center                           7100 St. Charles Ave.
636 Baronne Street                                            New Orleans, LA  70118
New Orleans, LA 70113                                         504-352-8019
504-558-9867                                                  Email:  nicktr@bellsouth.net
504-558-0378 (fax)

Attorneys for Louis Age, Jr.                                  Attorney for Louis Age, III

*/s/ Anna Friedberg*
Anna Friedberg
3110 Canal Street
New Orleans, LA 70119
504-444-8557
Email: anna.friedberg@gmail.com

Attorney for Ronald Wilson

**CERTIFICATE OF SERVICE**

This certifies that I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system that will send a notice of electronic filing to all counsel of record.

Dated:  March 8, 2022

*/s/ Richard Bourke*
RICHARD BOURKE