**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) **Case No. 16-32-2** |
| v. | ) **Section "M"** |
| | ) |
| **LOUIS AGE JR.** | ) **Judge Barry W. Ashe** |
| **LOUIS AGE III** | ) |
| **RONALD WILSON JR** | ) |
| **STANTON GUILLORY** | ) |

# MOTION FOR DISCOVERY PURSUANT TO RULES 16 AND 12(B)(4) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

**NOW COMES** defendants, Louis Age, Jr., Louis Age, III, Ronald Wilson, Jr. and Stanton Guillory, through undersigned counsel, and move this Court pursuant to the Fifth, Sixth and Eighth Amendments to the United States Constitution, Fed. R. Crim. P. 16 & 12(B)(4), and other applicable law, to order the government to immediately produce discovery pursuant to Rule 16 & 12(B)(4) and *Brady v. Maryland*, 373 U.S. 83 (1963).

The government has provided information about several jailhouse informants operating out of the Nelson Coleman Correctional Center in St. Charles Parish, Louisiana ("Nelson Coleman"). The government has also disclosed information revealing that a corrupt informant ring has been operating out of Nelson Coleman involving the manufacturing of false testimony designed to obtain sentencing benefits and the active recruitment of jailhouse informants to work in the ring. The government, to its credit, has announced it will not call three of the identified jailhouse informants but maintains it will call a fourth, M.C. because he has not yet admitted involvement in the corrupt ring.

The decision to limit its witness list to a single jailhouse informant from Nelson Coleman does not obviate the defense need to investigate and litigate the admissibility and reliability of this testimony. This is particularly significant because the government disclosures indicate that M.C. was brought to the government by a self-confessed member of the corrupt informant ring.

The defense seeks urgent discovery of information in the hands of the government that is favorable to the defense and necessary to the development and presentation of the defense case. This information directly relates to the corrupt jailhouse informant ring and the involvement of M.C. in that ring as well as to information tending to show that M.C. and others were acting as government agents for Sixth Amendment purposes, requiring exclusion of the tainted testimony.

**Government disclosures of intent to use jailhouse informant testimony and corruption in the jailhouse informant ring**

On February 25, and March 4, 2022 the government produced various 302's, containing the names and statements of five jailhouse informants. The jailhouse informants all profess to have obtained incriminating statements from each defendant. The statements range in time from 2019-2022, and collectively, purport to inculpate each defendant, either by his own admission, or the admission of a co-defendant, in the murder-for-hire of Milton Womack.

During this period, the informants and defendants were incarcerated at different facilities around Louisiana. However, each informants discussed in this motion was, at some point, incarcerated at Nelson Coleman. Each informant revealed, in statements to government agents, "confessions" allegedly made by one or more of the defendants implicating themselves and/or their co-defendants in the murder-for-hire plot. Each informant met with the same government agent(s) multiple times and was already involved with the government as informants or cooperators in other criminal matters. Each informant knew the identity of the other informants. Each informant stood to gain from providing information to the government and expected something in return for the information they produced. The 302s contain language claiming that some of the government actors sought to tread the line set in *Massiah* to use jailhouse informants but not direct them so much as to make them government actors. As will be seen below, this is window dressing at best.

The Nelson Coleman informants, to protect their identity, will be referred to as follows: J.R., G.S., M.C., and T.S.

The government has announced in writing that it will not call J.R., G.S. or T.S. but still hopes to rely upon the testimony of M.C., who the government claims is untainted by the corrupt informant ring at Nelson Coleman.

This discovery request relies upon and seeks information relevant to all the Nelson Coleman informants as all, including M.C. as the management of the informant ring is directly relevant to the application of *Massiah* to M.C.'s testimony and because the corruption of the informant ring is relevant to the impeachment of M.C. and the weight to be given to M.C.'s testimony.

**Statements of J.R. reveal a network of jailhouse informants working together and corruptly trading false information to exploit the system of sentence reductions as they worked hand-in hand with government agents across multiple cases**

J.R. pled guilty to a federal drug violation in 2018. Memorandum Requesting Downward Departure was filed by the government requesting a downward sentencing departure. In the Memorandum the government notes that J.R., incarcerated at Nelson Coleman, provided detailed information to deputies at the facility regarding the distribution of illegal narcotics, as well as intelligence on which inmates should be separated because of security concerns. Lt. Norvel Orazio, a deputy at Nelson Coleman, described the information J.R. provided as "significant and substantial." That is, J.R. was already acting as an ongoing informant for the government in Nelson Coleman and being paid in sentencing benefits before the conversations alleged here – he was, in every meaningful sense, already on the government payroll.

J.R. was incarcerated with Mr. Wilson at Orleans Parish Prison in 1999, and thereafter at Nelson Coleman. J.R. was also incarcerated with Mr. Age, III at Nelson Coleman. Between August 2, 2019, and November 8, 2021, J.R. gave several statements to government agents, both in person and via recorded telephone calls alleging that Wilson and Age III made incriminating statements to him inculpating themselves and their co-defendants in the conspiracy to kill Womack. The defense has been provided the 302's of those statements: summaries by the

government agents of what was said during the interviews. The defense has not been provided the audio of those statements.

In a telephonic interview conducted on August 2, 2019, J.R. was allegedly advised that "he was not to probe or question any inmate, including Wilson, for information. However, if J.R. overheard information and he wished to share the same with a law enforcement agency, including the FBI or the Detention Center, he could voluntarily do so." In addition to the phone interview conducted on August 2, 2019, it appears that J.R., with the consent of his attorney, was interviewed by government agents at Nelson Coleman. The fact that J.R. was already on the "payroll" and that his efforts to obtain and provide information to the government continued over multiple meetings with the government and alleged encounters with the defendants and with the participation of J.R.'s attorney belies any effort to mask J.R.'s role as one of a number of informants being managed as agents for the government in Nelson Coleman.

It is not clear whether the August 2, 2019, interview with J.R. was the first interview, but several more followed. Over the next several interviews J.R. continued to give government agents information he reported obtaining, from Age III, and Wilson.

In an interview with J.R. on February 12, 2020, J.R. told agents that Wilson suspected him of cooperating with the government and would no longer confide in him. J.R. also said that Wilson was confiding in another inmate, M.C., also housed at Nelson Coleman. As discussed below, M.C. was also a jailhouse informant, and purports to give information on multiple defendants in this case. It is highly significant that M.C. was introduced to the government as an informant in this case by J.R. given J.R.'s role in the corrupt informant ring and what the defense has learned about ring-members recruiting others to participate in their activities.

On January 25, 2022, the government met with J.R. and he revealed that, although some of the incriminating information J.R. received about Wilson, had come from Wilson, a portion of the

information regarding the murder-for-hire plot had been given to him by two fellow inmates, G.S. and T.S while he was incarcerated in Nelson Coleman. J.R. told government agents that G.S. and T.S. instructed him on what to say regarding a portion of the information he provided on the murder-for-hire plot. J.R. also revealed that G.S. wanted money in exchange for the information he provided to J.R, and that T.S. wanted protection in exchange.

G.S. is one of the most notorious and prolific informants in EDLA and his activities and unusual relationship with the U.S. Attorney's Office for EDLA have been the subject of public criticism. Court records show that he is currently actively engaged in seeking a sentence reduction for cooperation with the authorities.

T.S. provided his own information to government agents, information he allegedly obtained from Wilson while they, along with J.R. and M.C. were incarcerated at Nelson Coleman. All three jailhouse informants, housed at Nelson Coleman at the same time, provided information to government agents that allegedly came from the defendants, and that inculpated one or more defendants.

**T.S. claimed he had heard things from one or more defendants but did not disclose that he was a part of the corrupt informant ring or involved in recruiting others to participate**

T.S. plead guilty to robbery in 2021. His sentencing hearing has been continued at least twice, and he currently has a sentencing hearing set in mid-2022.

Two 302's, memorializing in-person interviews, with T.S. were provided to the defense. One interview was conducted on January 20, 2019, and one on July 22, 2019. During the interviews, T.S. revealed that he had been incarcerated with Mr. Guillory at Orleans Parish Prison, and with Mr. Age, Jr. at St. Tammany Parish Jail. While incarcerated in OPP, Guillory made inculpatory statements to him regarding the murder-for-hire plot. T.S. also reported that while he and Age, Jr. were housed at the St. Tammany Parish Jail, Age, Jr. made inculpatory statements about himself and his co-defendants regarding their participation in the murder-for-hire.

In neither of those interviews was T.S. allegedly advised, as was J.R. (above) and M.C. (below) had been, "not to seek information (question) from Wilson, but he could listen if Wilson was talking and provide the writer with anything Wilson volunteered."

T.S. ended up at Nelson Coleman where Wilson and Age III were housed but did not personally claim conversations with the defendants, however, as J.R.'s statement shows, T.S. was involved as a part of a corrupt informant ring in manufacturing false testimony.

Since the disclosures defense investigation has disclosed credible information that after his transfer to Nelson Coleman, T.S. sought to recruit others to act as informants, would mine case information to support false jailhouse informant testimony, had recruited J.R. for his ring and sought money from other inmates for his services in setting up false jailhouse informant testimony to allow access to sentencing reductions.

**Like T.S., M.C. claims to have had heard things from one or more defendants but did not disclose that he was a part of the corrupt informant ring**

M.C. was charged in 2018 with distribution of heroin.  M.C. plead guilty in May 2018, and while awaiting sentencing, has been incarcerated at Nelson Coleman.  In connection with that plea, the government filed a Motion and Memorandum for Sentencing Departure, requesting a downward departure on November 22, 2019.  In that motion the government noted that a downward departure was appropriate as M.C. had provided "substantial cooperation" in making a case against a possible co-defendant and a heroin supplier.

In that same motion, the government noted two additional instances where M.C. had tried to assist the government by providing information he obtained from inmates while incarcerated at Nelson Coleman. On one occasion M.C. met with the government to provide information on a jailhouse confession made to him.  Although the government did not use M.C. as a witness in that case for strategic reasons, the government still considered the information accurate.  The government also wrote in the motion that M.C. even more recently offered information regarding another active case, but because the Court would not continue M.C.'s sentencing again, any credit for potential

assistance in that case would have to come through later proceedings. Despite representations that M.C.'s sentencing would not be continued, the sentencing was continued and is currently set in mid-2022.

M.C. was clearly, in every meaningful sense, on the government payroll as a jailhouse informant and being paid in sentence reductions. Indeed, he was on the payroll as an informant in multiple cases involving jailhouse informant testimony out of Nelson Coleman, the location now known to be the home of a corrupt informant ring.

M.C. gave his first statement to government agents on January 14, 2020. The interview took place at the U.S. Attorney's Office. The government does not disclose how M.C. came to be interviewed but J.R.'s statement suggests that his name was offered up as a possible source by J.R.. M.C. reported that in mid-2019, while on the same tier, he and Wilson got close. M.C. revealed to agents that Wilson had made statements to him detailing the murder-for-hire scheme and inculpating both himself and his co-defendants. M.C. alleges that Wilson further inculpated himself in other crimes. On January 21, 2020, during M.C.'s second interview, the 302 states that "Wilson volunteered information to [M.C.] regarding numerous things since the above referenced 1/14/2020 interview."

On February 10, 2020, M.C. called a government agent to give an interview. M.C. reported that Wilson told M.C. that the FBI had approached him and told Wilson that they knew where he was when the murder took place. The agent supposedly "admonished [M.C.] not to seek information (question) from Wilson, but he could listen if Wilson was talking and provide the writer with anything Wilson volunteered. The [agent] also advised M.C. to let [M.C.'s] attorney know about the information [Wilson] gives the FBI.

Again, on March 2, 2020, the agent again "admonished [M.C.] not to seek information (question) from Wilson, but he could listen if Wilson was talking and provide the writer with anything Wilson volunteered. The [agent] also advised M.C. to let [M.C.'s] attorney know about the

information [Wilson] gives the FBI."

**An urgent discovery order is needed because the government has been running jailhouse informants at Nelson Coleman over a course of years and this has now been exposed to be a corrupt informant ring**

The evidence of jailhouse informants is some of the most unreliable but at the same time prejudicial evidence that can emerge in a criminal case. So dangerous is this evidence that the Fifth Circuit Pattern Instructions caution jurors about accepting the evidence. "[J]jailhouse informants have played a role in 156 proven wrongful convictions in the United States, according to the National Registry of Exonerations . . . [and] . . . incentivized informant witnesses were the leading cause of wrongful convictions in U.S. capital cases."[1]

Not only is the credibility of jailhouse informants highly suspect but the admissibility of their testimony is subject to constitutional limitations because of the capacity of jailhouse informants being managed by the government to circumvent the protections of the Fifth and Sixth Amendments.

After the Sixth Amendment attaches, it guarantees an accused access to counsel at all "critical stages" of prosecution. *United States v. Wade*, 388 U.S. 218, 226 (1967). One such stage is pre-trial interrogation—whether directly confrontational, or "indirect and surreptitious." *Massiah v. United States*, 377 U.S. 201, 205–06 (1964) ("[I]f [the right to counsel] is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse."); *accord, e.g., Montejo v. Louisiana*, 556 U.S. 778, 786 (2009); *Maine v. Moulton*, 474 U.S. 159, 176 (1985); *United States v. Henry*, 447 U.S. 264, 274–75 (1980); *Escobedo v. Illinois*, 378 U.S. 478 (1964).

The State may not use trickery and deceit to extract incriminating evidence from an unwitting and uncounseled defendant. *See Massiah*, 377 U.S. at 206. The Sixth Amendment is therefore violated when any state agent elicits incriminating statements from a defendant with counsel absent. *Id*; *see also Kuhlman v. Wilson*, 477 U.S. 436, 459 (1986) (agent must "take some

---

[1] Innocence Project, *Safeguarding Against Unreliable Jailhouse Informant Testimony* available at https://innocenceproject.org/safeguarding-against-unreliable-jailhouse-informant-testimony/ (last visited 3/8/22).

action, beyond merely listening, that was designed deliberately to elicit incriminating remarks"); *Blackmon v. Scott*, 22 F.3d 560, 567 (5th Cir. 1994) ("[E]ven when officers instruct an agent not to ask defendant questions about his case, if the agent does more than just listen to elicit incriminating remarks, a Sixth Amendment violation occurs.")(citation omitted). *Massiah* is triggered even if a defendant initiates the conversation with the State agent. *See Beatty v. United States*, 377 F.2d 181, 193 (5th Cir. 1967), *rev'd by* 389 U.S. 45 (1967) (summary reversal because Court of Appeals declined to apply *Massiah* on ground defendant initiated conversation with agent). *Massiah* violations are prone to occur in the jail setting, where inmates are "particularly susceptible to the ploys" of informants. *United States v. Henry*, 447 U.S. 264, 274 (1980) ("the mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover government agents.")

For a *Massiah* violation to occur, an informant must be a "government agent" at the time he elicits the statements, but agency exists in circumstances other than formal agreements. *See Horner v. Thaler*, 361 Fed. Appx. 584, 586-87 (5th Cir. 2010) (agency conceded where informant's lawyer had confirmed to authorities that he was cooperating). Even if the government does not deliberately create the opportunity to interrogate the defendant without counsel, the government still breaches its obligation if it knowingly exploits an opportunity to do so. *Maine v. Moulton*, 474 U.S. 159, 176 (1985) ("knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity.")

Further, *Massiah* is triggered not only when an informant acts pursuant to specific instructions from the government, but also when he has "otherwise submitted to the State's control." *Creel v. Johnson*, 162 F.3d 385, 394 (5th Cir. 1998) "whether Plangman acted pursuant to instructions from the State, or otherwise submitted to the State's control."). Thus, if a

government actor so much as "direct[s] or steer[s] the informant toward the defendant," the Sixth Amendment is violated. *Thompson v. Stephens*, 13-1900, 2014 U.S. Dist. LEXIS 82716, at *11-12 (S.D. Tex. June 18, 2014)( *quoting United States v. York*, 933 F.2d 1343, 1356 (7th Cir. 1991)).

The government is in possession of information relevant both to the status of these jailhouse informants as government agents under *Massiah* and its progeny and also relevant to the credibility of M.C. in light of the corrupt informant ring operating at Nelson Coleman and his status on the government's "payroll."

Habeas relief was recently granted in a capital case arising from violations of *Brady* and *Massiah* due to the improper introduction of a jailhouse informant's testimony at trial. *Prible v. Davis*, 2020 U.S. Dist. LEXIS 89711 (S.D. Tex. May 20, 2020). That case is significant not only for its ruling but for its extraordinary procedural history. The case went through multiple rounds of state and federal collateral review as more and more evidence uncovered how the jailhouse informant system was used to encourage inmates to improperly obtain and falsify what they represented to be truthful, and legally obtained confessions, for selfish gain.

The defendants seek discovery of that information now, prior to trial, as the law provides.

**Defense requests the following information**:

1. The date, place, and manner of all contact with each jailhouse informant.

2. A statement of how contact with each jailhouse informant was initiated.

3. An audio copy, if available, of all statements made by, or government communication with, each jailhouse informant.

4. 302's, reports or notes taken by government agents of any conversations had with each jailhouse informant regarding their role as informants in this or other cases. For this purpose, government agents include law enforcement personnel at Nelson Coleman who helped to facilitate the government's use of informants in that facility.

5. Any conversations had, or agreements made concerning benefits in exchange for testimony.

6. Number of times and in what cases/investigations has each jailhouse informant offered information.

7. Name of the government agents involved in the interviewing of each jailhouse informant in each instance the informant provided information or sought benefit..

8. The dates that each defendant was incarcerated with each individual jailhouse informant.

9. Information on where each defendant was housed in relation to where the jailhouse informants were housed when incarcerated in the same facility.

10. When and why jailhouse informants were transferred from other facilities to Nelson Coleman or within Nelson Coleman.

11. Any communications between government agents and Nelson Coleman staff regarding the treatment, placement or managements of any of the defendants or jailhouse informants.

12. What actions were taken by any government agents to investigate a reduced sentence.

13. Substance of any conversations between government agents and the attorney's that represented the jailhouse informants.

Respectfully submitted,

*/s/ Anna Friedberg*
Anna Friedberg
3110 Canal Street
New Orleans, LA 70119
504-444-8557
Email: anna.friedberg@gmail.com

Attorney for Ronald Wilson

*s/ Jessica Mullaly*
Jessica L. Mullaly, LA Bar #26674
Attorney for Ronald Wilson
7925 nelson Street
New Orleans, LA 70125
Telephone: 504-258-7294
Email: jessicamullaly1@gmail.com

Attorney for Ronald Wilson

*/s/ Richard Bourke*
Richard Bourke, LA #31428
Christine Lehmann LA 28122
Attorneys for Louis Age, Jr.
Louisiana Capital Assistance Center
636 Baronne Street
New Orleans, LA 70113
504-558-9867
504-558-0378 (fax)

Attorneys for Louis Age, Jr.

*/s/ Alysson L. Mills*
ALYSSON L. MILLS
650 Poydras Street, Suite 1525
New Orleans, LA 70130
amills@millsamond.com

Attorney for Stanton Guillory

*/s/ Kerry P. Cuccia*
KERRY P. CUCCIA
3801 Canal Street
Suite 400
New Orleans, LA 70119
504-595-8965
Email: kerryc@capitald.org

Attorney for Stanton Guillory

*Nicholas J. Trenticosta*
Nicholas J. Trenticosta
Herrero & Trenticosta
7100 St. Charles Ave.
New Orleans, LA 70118
504-352-8019
Email: nicktr@bellsouth.net

Attorney for Louis Age, III

## CERTIFICATE OF SERVICE

I hereby certify that on 03/10/2022 I electronically filed the foregoing with the Clerk of Courtby using the CM/ECF system which will send a notice of electronic filing to all parties.

*/s/ Anna Friedberg*